UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| MARTIN SILVERSTEIN, on behalf of himself and all others similarly situated | |
|     Plaintiff, | Civil Action No. 3:23cv684 |
|     v. | **CLASS ACTION COMPLAINT** |
| GENWORTH LIFE INSURANCE COMPANY, | **DEMAND FOR JURY TRIAL** |
|     Defendant. | |

Plaintiff Martin Silverstein ("Silverstein" or "Plaintiff"), individually and on behalf of all others similarly situated, for his Complaint against defendant Genworth Life Insurance Company ("GLIC"), states as follows:

## NATURE OF THE ACTION

1.  This is a class action brought on behalf of Plaintiff and similarly situated owners of life insurance policies insured by GLIC. Plaintiff seeks to represent a class of GLIC policyholders who have been subjected to massive, unlawful and excessive cost of insurance ("COI") increases by GLIC in violation of the terms of their insurance policies.

2.  The policies at issue in this case are GE Gold and GE Gold II policies, and all other universal life insurance policies (or "UL policies"), issued or insured by GLIC (or its predecessors in interest) that experienced the increases in Monthly Risk Rates or rate schedules (the "Subject Policies"), that began taking effect on each policy anniversary after December 1, 2019.

3.  The principal benefit of universal life policies generally, and the Subject Policies specifically, is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies are flexible and need only be sufficient

to cover the COI charges and certain other specified expenses. The COI charge is typically the highest charge that a policyholder pays, and the GLIC policies explain how the COI charge is calculated using "COI rates" that are equal to "monthly risk rates" divided by an interest rate factor. Because the COI charges are the main driver of how much money needs to be paid into these policies, and because Monthly Risk Rates dictate how large the COI charge is, the provision in the policy explaining how and when the Monthly Risk Rates can be adjusted is one of the most important terms of the contract. Here, the policies state that there are three main contractual requirements for adjusting Monthly Risk Rates:

> The Company will <u>base any change</u> on its expectations as to future investment earnings, mortality, persistency, expenses and taxes. <u>The Company will not make any change in order to recoup prior losses</u>. <u>Any change</u> in the monthly risk rates <u>will apply to all insureds with the same combination of the following</u>: attained age; number of years of insurance in force; net amount of risk; and premium class.

4.    In September 2019, after Plaintiff's policy had been in force for almost 16 years, GLIC, together with Genworth Life Insurance and Annuity Company ("GLAIC," and together with GLIC and Genworth Financial, Inc., "Genworth") announced a gigantic Monthly Risk Rate hike effective December 1, 2019. Genworth told policyholders that following the increase, Monthly Risk Rates would be between 30 percent and 140 percent higher than the pre-existing Monthly Risk Rate scale. This resulted in a massive increase in premiums required to maintain these policies in force.

5.    In a Bulletin sent for "producer/agent use only," which Genworth asked "NOT TO BE REPRODUCED OR SHOWN TO THE PUBLIC," Genworth stated that "almost all policyholders will experience an increase in cost of insurance charges as a result of this adjustment

in at least one upcoming policy year." In that bulletin, Genworth gave the following cryptic explanation for the increases:[1]

**The Basis for the Adjustment**

Genworth's change in the monthly risk rate, and resulting change in cost of insurance charges, is based on its expectations as to future investment earnings, mortality, persistency, expenses, and taxes, as set forth in the Policy. In accordance with the Policy, this adjustment is being made for all policies on the same policy form with the same combination of the following characteristics: Attained Age, sex, length of time insurance has been in force, net amount at risk, and premium class.

6. Genworth further explained that it would not directly inform policyholders about the increase until "90 days in advance of the anniversary on which the adjustment will take effect." Genworth further explained that it "cannot provide policyholders with an illustration using the current cost of insurance rates," even though the policies promise that Genworth will provide those illustrations to policyholders upon request.

7. GLIC did not send Plaintiff his Monthly Risk Rate increase notice until July 8, 2020, roughly ten months after Genworth confidentially notified its producers and agents. The letter discloses massive, ascending Monthly Risk Rate increases that would commence on Plaintiff's October 6, 2020 policy anniversary, with the percentage increases starting at ***31.06%*** and increasing on each policy anniversary thereafter, eventually reaching ***121.15%*** at age 94, and ***119.76%*** at age 98:

---

[1] The Bulletin states that "Genworth companies include:" "Genworth Life and Annuity Insurance Company," "Genworth Life Insurance Company," and "Genworth Life Insurance Company of New York." The Bulletin announces a Monthly Risk Rate Increase only for policies issued by the former two companies (but not Genworth Life Insurance Company of New York ("GLICNY")), and explains that "only Genworth Life Insurance Company of New York is admitted in and conducts business in New York." The Bulletin refers to "Genworth's change in monthly risk rate," and to "its expectations as to future investment earnings, mortality, persistency, expenses, and taxes," and treats those as the same for all Genworth entities.

**Comparison Table of Monthly Risk Rates**
**(Rates shown are per $1,000 of net amount at risk)**

The Table below compares the current monthly risk rate to the adjusted monthly risk rate effective with your next policy anniversary, 10/06/2020, for each policy year until the Insured's age 100.

| Insured's Attained Age | Policy Year | Current Monthly Risk Rate | Adjusted Monthly Risk Rate | Difference % |
|---|---|---|---|---|
| 78 | 18 | 1.61 | 2.11 | 31.06 |
| 79 | 19 | 1.61 | 2.16 | 34.16 |
| 80 | 20 | 1.61 | 2.19 | 36.02 |
| 81 | 21 | 1.83 | 2.50 | 36.61 |
| 82 | 22 | 2.06 | 2.84 | 37.86 |
| 83 | 23 | 2.32 | 3.29 | 41.81 |
| 84 | 24 | 2.50 | 3.73 | 49.20 |
| 85 | 25 | 2.70 | 4.23 | 56.67 |
| 86 | 26 | 2.91 | 4.30 | 47.77 |
| 87 | 27 | 3.14 | 4.98 | 58.60 |
| 88 | 28 | 3.37 | 5.68 | 68.55 |
| 89 | 29 | 3.62 | 6.44 | 77.90 |
| 90 | 30 | 3.87 | 7.24 | 87.08 |
| 91 | 31 | 4.14 | 8.15 | 96.86 |
| 92 | 32 | 4.42 | 9.23 | 108.82 |
| 93 | 33 | 4.73 | 9.77 | 106.55 |
| 94 | 34 | 5.06 | 11.19 | 121.15 |
| 95 | 35 | 5.43 | 11.70 | 115.47 |
| 96 | 36 | 5.83 | 12.65 | 116.98 |
| 97 | 37 | 6.28 | 13.48 | 114.65 |
| 98 | 38 | 6.78 | 14.90 | 119.76 |

8.     The manner in which the percentages continually increase each year is unusual and appears deliberately designed to induce older-age lapses, thereby allowing GLIC to avoid the payment of death benefits (after collecting decades of premiums). This tactic is referred to in the industry as inducing "shock lapses," which means exactly what it sounds like: policyholders are

so shocked by the magnitude of a rate increase relative to prior expectations that they simply abandon their policies and relieve the insurer of the obligation to pay any death benefits.

9. The July 8, 2020 letter also repeated the generic explanation contained in the internal bulletin. Other than that explanation, Genworth has not provided policyholders with any purported actuarial justification for the increase.

10. The Subject Policies were all issued a long time ago, many almost twenty years ago. As a consequence, a significant portion of the policyholders are now elderly; many of them are 75 years old or older. Plaintiff himself was 78 years old when he received his Monthly Risk Rate increase notice, and is now 81 years old. These policyholders bought and maintained the policies so that they and their families would be protected by life insurance coverage as they entered their senior years. To that end, the policyholders were promised the protection of the contractual guarantees that their policies would be credited with interest not less than four percent and that Genworth would not raise the Monthly Risk Rates to increase its own profits at their expense. The Monthly Risk Rate increase violates the policies in numerous respects.

11. ***First***, these rates are designed to compensate the insurer for the mortality risk of the insureds, which is why Genworth calls them "monthly risk rates," and the main driver of those rates are the insurer's mortality expectations. To justify such a massive rate hike, GLIC must have experienced a recent, massive deterioration in its mortality expectations in 2019. But both industry experience and GLIC's own statements belie any such claim: mortality experience has materially improved industry-wide since the Subject Policies were issued, and GLIC itself has repeatedly acknowledged in recent years that its mortality expectations have continued to *improve*. Because GLIC only pays death benefits on a UL policy at the time of death, and deducts COI (and other) charges from the policy account until that time, mortality improvements lead to *higher* profits for

Genworth on UL policies, which should have led to a *decrease* in the Monthly Risk Rates, not an increase in those rates. There is no ground for the massive rate hikes imposed by Genworth in light of improving mortality.

12.     It is now well-documented that nationwide mortality expectations have *improved* significantly over the past several decades. The Society of Actuaries ("SOA") and the American Academy of Actuaries (the "Academy") periodically publish mortality tables using information collected from America's largest insurers. Those tables show that mortality expectations have improved at a rate of roughly 1 percent per year over the past three decades.

13.     And when answering an interrogatory by insurance state regulators in its 2018 annual filings with the National Association of Insurance Commissioners ("NAIC") if there are "anticipated experience factors underlying any non-guaranteed elements different from current experience," GLIC stated that the difference between anticipated experience in 2018 from current experience that same year "is the expectation of th**e continuation of recent trends such as mortality improvement** . . ." This opinion was signed on February 5, 2019 by GLIC's Vice President, Lance Berthiaume, FSA, MAAA.

14.     GLIC made similar representations in its regulatory filings for every year between 2014 and 2017, in each case referencing a continuation of "recent trends" of "mortality improvement," which it anticipated would continue. This means that, the five years leading up to the Monthly Risk Rate increase, GLIC expected—and continues to expect—mortality rates to improve and insureds to live longer than GLIC previously anticipated. For a universal life policy, where GLIC collects premiums as long as the policyholder is alive and pays death benefits only when the policyholder dies, GLIC's cost of providing insurance has continued to decrease as mortality expectations continue to improve.

15.     Indeed, Genworth Financial, Inc. ("Genworth Financial"), and its subsidiaries, have repeatedly relied on its improved mortality expectations in the last seven years to justify premium increases valued at **$11.5 billion** for a different type of Genworth insurance product, called long term care insurance ("LTC"). In an October 2019 earnings call, Genworth touted its success in achieving an astounding "$11.5 billion of approved LTC premium rate increases" since 2012, measured on a net present value basis. Contrary to universal life policies where improved mortality expectations lead to greater profits for Genworth, Genworth *loses* money on its LTC policies when its mortality expectations improve because the longer people live, the more long-term care costs Genworth must pay to policyholders. Genworth Financial—which reports in consolidated filings on behalf of itself and its subsidiaries, including GLAIC and GLIC—has explained in its Annual Reports that improved mortality expectations hurt its LTC business but help its life insurance business, saying: if "mortality rates are lower[] than our pricing assumptions, we could be required to make greater payments under long-term care insurance policies and annuity contracts than we had projected. Conversely, if mortality rates are higher than our pricing assumptions, we could be required to make greater payments under our life … insurance policies." From 2012 through 2019, GLIC repeatedly cited this mortality improvement as a "main driver" of the LTC premiums increases:

**Key Information Used to Develop the Rates Including the Main Drivers**

"Our rates are based on assumptions regarding persistency (how long the policy stays in force), mortality (at what rate deaths occur), and voluntary lapses (when an insured voluntarily terminates his policy). Actual results are much higher than anticipated when the policy was originally priced which means that individuals are living longer and keeping their policies in force longer which results in more claims incurred. As a result, premiums must be adjusted to ensure current and future claims are adequately funded."

16.     Genworth cannot have it both ways: claiming that its mortality expectations have improved to justify LTC premium increases but ignoring that same fact in imposing increasing

COI charges. Genworth's massive Monthly Risk Rate hike cannot be warranted due to its changed mortality expectations in light of this mortality improvement.[2]

17.     ***Second***, none of the other factors that Genworth claims to have based the increase on—investment earnings, persistency, expenses and taxes—have changed materially for the worse, or could justify such a massive Monthly Risk Rate hike, especially in light of the improved mortality. For example, Genworth recently touted that the 2017 Tax Cuts and Jobs Act, which, among other things, reduced the federal corporate income tax rate from 35% to 21%, led to "$154 million of tax benefits associated with revaluing our deferred tax assets and liabilities to the new rate on the date of enactment." So GLIC's "expectations as to future… taxes" have not only not deteriorated—they have significantly improved. And, given that mortality is by far the largest driver of Monthly Risk Rates, it is impossible that any changes in investment earnings, expenses, or persistency could have justified the massive rate increases that GLIC is imposing.

18.     Moreover, GLIC regularly sends policyholders a report on the "illustrative future death benefits and policy values," and the policies hit by the Monthly Risk Rate increase promise that policyholders will receive "a new projection of values" if they "ask" for it. Up until March 31, 2018, GLIC continued to send illustrations to policyholders in which GLIC "projected" that the *old, cheaper* Monthly Risk Rates would continue for the life of the policy. And then, Genworth suddenly decided to raise rates in 2019. But nothing changed in that short period of time since March 31, 2018 to justify this massive rate increase. As discussed, mortality expectations—by far the biggest driver of Mortality Risk Rates—have been improving industry-wide at a rate of approximately 1 percent per year. And lapse rates are relatively stable industry-wide, especially

---

[2] Because the rate increase was determined and announced internally in 2019, it pre-dated and could not have been based at all on any alleged rise in mortality attributable to the COVID-19 pandemic.

for policies, like all Subject Policies, that (on information and belief) have been in force for at least six years.

19.    **_Third_**, Genworth's massive rate increase recoups prior losses, in breach of the contractual provision stating that GLIC "will not make any change" in Monthly Risk Rates "in order to recoup prior losses." The purpose of this provision is two-fold. First, it means that GLIC cannot pass along to policyholders losses arising from past events or decisions; it can only adjust rates when it anticipates that new changes in its expectations will result in *future* losses. Second, it prevents the insurer from engaging in bait-and-switch tactics, such as where it sends illustrations to policyholders projecting current Monthly Risk Rates to continue in the future and then, after selling policies with those illustrations, collecting hundreds of millions of dollars in premiums, and locking customers into their contracts, years later reveals more expensive Monthly Risk Rates due to changes in expectations that happened long ago or for mortality expectations that were known at the time of the sale. For example, if an insurer knows at pricing that its Monthly Risk Rates are 20% too low, it cannot use those rates to sell thousands of policies and then turn around a decade later and increase rates by 20%.

20.    But, as discussed, Genworth's mortality expectations (including GLIC's) have only improved from issuance to 2019, and any mismatch between its pricing assumptions and its current assumptions would have been known and recognized by Genworth many years ago. Similarly, the other actuarial factors upon which Genworth claims to have based the increase have either improved or remained stagnant in the years preceding the rate increase. As a result, to the extent the Monthly Risk Rate increase offsets alleged losses, those losses were recognized many years ago, and the rate increase was designed to recoup losses. Further, the rate increase was improperly designed to boost profits and to shore up Genworth's failing LTC care business, which has

sustained severe losses in the past decade. Shortly after the Monthly Risk Rate increase was announced, Genworth Financial's CFO stated on an earnings call that the "rate actions" and "prudent management of in-force blocks" were needed to allow Genworth to satisfy policyholder obligations, in light of the past financial troubles of the LTC business.

21.    ***Fourth***, Genworth has not applied the change in Monthly Risk Rates to "all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class," in breach of the contract. Specifically, Genworth has breached this provision in at least three ways:

- The Genworth entities exempted all New York policies from the rate increase, despite those policies being materially identical and having the same "attained age; number of years of insurance in force; net amount of risk; and premium class." The Bulletin announcing the rate increase, for example, says: "States – All except New York." This violates the terms of the Subject Policies.

- The Monthly Risk Rate increase differs for males and females, even though, as can be seen from the "combination" to which a change must be uniformly applied, there is no option to differentiate between male and female insureds. In other words, insureds with the same "attained age; number of years of insurance in force; net amount of risk; and premium class" were subject to different rate changes depending on their sex, in violation of the terms of the Subject Policies.

- Genworth also did not implement the rate increase on other universal life products that it issued during the same time period. Indeed, one would expect that if GLIC's expectations were so wrong that a 100%+ Monthly Risk Rate increase is now

required, this would impact all Genworth policies issued around the same time. But GLIC has targeted only two universal life products with increases.

22.    In addition, in violation of the policy provision that promises illustrations if policyholders "ask" for them, GLIC started refusing to provide in-force illustrations using current Monthly Risk Rates for the Subject Policies.

23.    GLAIC was sued in a class action for its Monthly Risk Rate increase in *Brighton Trustees, LLC, et al. v. Genworth Life and Annuity Insurance Company*, Case No. 3:20-cv-240-DJN (E.D. Va.), which GLAIC resolved for over $44.8 million in monetary and nonmonetary benefits. That settlement did not include policies issued by or insured by GLIC.

24.    The Monthly Risk Rate hike and Genworth's actions preceding it therefore breached the GLIC policies in at least four respects:

> (a)  not determining Monthly Risk Rates based on the factors enumerated in the contract;
>
> (b)  imposing a massive increase in Monthly Risk Rates to recoup prior losses;
>
> (c)  imposing non-uniform rate hikes on insureds; and
>
> (d)  refusing to provide an illustration upon request.

## THE PARTIES

25.    Plaintiff Martin Silverstein is an individual who is domiciled in and a citizen of Ohio. Dr. Silverstein is the owner of a GE Gold policy issued with the Policy Number 0001008660 and written on Form No. ULGE01. The policy was originally issued to Dr. Silverstein in the State of Florida by General Electric Capital Assurance Company, which changed its name to Genworth Life Insurance Company on January 1, 2006.

26.    Defendant Genworth Life Insurance Company ('GLIC") is a corporation organized and existing under the laws of Delaware and has its principal place of business at 6604 West Broad Street, Richmond, Virginia. GLIC is the corporate parent of GLAIC, owning 100 percent of its stock. GLIC and GLAIC together own Genworth Life Insurance Company of New York ("GLICNY"), owning 65 percent and 34.5 percent of its stock, respectively. The ultimate corporate parent of GLAIC, GLIC and GLICNY, is Genworth Financial, Inc.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member (including Plaintiff) and one defendant and the aggregate amount of damages exceeds $5,000,000, and unnamed class members are citizens of states across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

28.    This Court has personal jurisdiction over GLIC, which has its principal place of business in Virginia.

29.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(c) because Defendant resides here and the events giving rise to Plaintiff's causes of action occurred in this District, including GLIC's COI overcharges.

## FACTUAL BACKGROUND

### A.    Cost of Insurance and Monthly Risk Rates

30.    The policies at issue are flexible-premium, universal life policies issued by GLIC (including its predecessors). They were all issued on standardized policy forms and insureds are not permitted to negotiate different terms. The class on whose behalf this action is being brought

consists of all owners of GE Gold, GE Gold II, and all other universal life insurance policies issued or insured by GLIC that have been, or will be, subjected to the Monthly Risk Rate increase that Genworth began announcing in or about September 2019.

31.    The Subject Policies are all flexible-premium, universal life policies, and there are no fixed or minimum premium payments required by the policies. The principal benefit of UL policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest expense that a policyholder pays. The COI charge is deducted from the policy account (i.e., the savings component) of the policy on a monthly basis, so the policyholder pays the COI charge entirely to GLIC. Any premiums paid in excess of COI charges and expense components are applied to the policy account, sometimes known as "policy value" or "cash value." These excess premiums earn interest at a declared interest rate not less than the guaranteed minimum interest specified in the policy. For the Subject Policies, GLIC agreed that it would credit interest on the policy value at a guaranteed minimum rate of 4 percent. In addition to COI charges and other deductions from the policy value, GLIC collects and pockets a 7% "premium expense charge" off the top from every premium payment received.

32.    The structure of UL policies is beneficial because it allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Depending on the interest rate environment and the credited rate, other policyholders may choose to heavily fund their policies and use the interest to pay COI charges and grow the policy value.

33.     The size of the COI charge is highly significant to Plaintiff and all UL policyholders for at least two important reasons. First, it dictates the minimum amount of money they must pay to keep a policy in force. Second, high COI charges can quickly diminish policy value and reduce the amount of money on which the policyholder can earn interest. Absent a secondary guarantee, if policy value diminishes such that COI charges can no longer be deducted, and the appropriate time expires after Genworth provides an accurate and adequate grace notice, then a policy will lapse unless additional premiums are paid in.

34.     The COI charge is calculated using "COI rates" that are equal to "monthly risk rates" divided by an interest rate factor. Each of the Subject Policies has similar language regarding how adjustments to Monthly Risk Rates will be determined. Plaintiff's policy states as follows:

**CHANGES IN RATES, CHARGES AND FEES**
At its sole discretion, the Company may change the monthly risk rates and the credited interest rates. The monthly risk rates will not exceed the Guaranteed Maximum Monthly Risk rates and the credited interest rates will not be less than the Guaranteed Credited Interest Rate. The Guaranteed Maximum Monthly Risk rates and the Guaranteed Credited Interest Rate are shown in the Schedule.

The Company will base any change on its expectations as to future investment earnings, mortality, persistency, expenses and taxes. The Company will not make any change in order to recoup prior losses. Any change in the monthly risk rates will apply to all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class.

35.     On information and belief, all polices hit by the Monthly Risk Rate increase contain materially the same terms as above. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

36.     Universal life policies are designed to be permanent policies, which are held until the death of the insured. As Genworth's Annual Reports explain: "Our universal life insurance products are designed to provide permanent protection for the life of the insured."

**B.     Genworth's Announcement of Unlawful Monthly Risk Rate Hike**

37.     In September 2019, Genworth sent a bulletin to its agents announcing the massive increase in cost of insurance charges for "GE Gold and First Choice Gold (Gold) as well as GE Gold II and First Choice Gold II (Gold II) Universal Life Insurance policies issued by Genworth Life Insurance Company (GLIC) and Genworth Life and Annuity Insurance Company (GLAIC)." The amount of the new COI charges and the actuarial justifications for them were not disclosed. Genworth disclosed only that "almost all policyholders will experience an increase in cost of insurance charges," and that the increase is "based on" Genworth's "expectations as to future investment earnings, mortality, persistency, expenses, and taxes, as set forth in the policy." The bulletin explains that Genworth will not send notification of the increase until 90 days before it goes into effect—which is on the first policy anniversary for each policy after December 1, 2019— and that Genworth will not provide an illustration to policyholders depicting future policy values using the new Monthly Risk Rates, despite the fact that the contracts require that.

38.     The letters that Genworth sent to policyholders are even more cryptic. They say:

**Q1.    Why is Genworth adjusting the monthly deductions from the Policy Value?**

**A.**    Your policy provides that the issuing insurance company (the Company) may change the Monthly Risk Rates used to calculate monthly cost of insurance charges based on its expectations as to future investment earnings, mortality, persistency, expenses, and taxes. That is the basis for these adjustments. The health of any insured person is not considered in making this kind of adjustment. Additionally, the Company cannot increase the rate higher than the Maximum Monthly Risk Rates stated in the policy.

39.     The letters further explain that this "adjustment to Monthly Risk Rates may negatively impact the Policy Value because, in general, it effectively increases the Monthly Deductions" that are taken out of the policy each month. The letters also warn that the rate hike "may increase the risk of policy lapse," and that a "failure to adjust premium payments to account for reduced policy values resulting from the change to the Monthly Risk Rates may increase the risk of policy lapse." On information and belief, all policyholders subjected to the increase have received or will receive the foregoing communications. The letters include a table reflecting "the

change in the Monthly Risk Rate" for the policy as a result of the increase, showing increases between 30 percent and 140 percent depending on the year.

40.     Like the bulletin, the letters also say that Genworth refuses to provide new illustrations using the new Monthly Risk Rates, even though the Subject Policies require it to do so upon request.

**Q9.    Can I get an illustration based on the new rates?**

A.    Unfortunately, we will not be able to provide an inforce illustration reflecting this adjustment. Illustration regulations and Actuarial Standards of Practice (ASOP) set out certain conditions for use of current rates. Presently, Gold and Gold II do not meet those conditions; therefore, we cannot provide policyholders with an illustration using the current cost of insurance rates. What we can provide is a projection based on the policy guarantees—the lowest contractual interest rate and highest contractual monthly risk rates—which may be substantially more conservative than an illustration using current rates. We can provide information based on current rates and charges for one policy year.

41.     Genworth did not explain why the increases vary so much from year to year—some years 31 percent and others 120 percent—nor did it explain the rationale for the massive increase. The limited disclosures that Genworth did make were false: as discussed below, the rate increases were not "based upon" Genworth's "expectations as to future investment earnings, mortality, persistency, expenses, and taxes," but rather were designed to recoup prior losses, increase GLIC's profits, and offset losses from GLIC's LTC division.

**C.    Genworth's Unlawful Hike in Cost of Insurance Charges**

    **i.    The Monthly Risk Rate Increase Was Not Based on Contractually Permissible Factors**

42.     Plaintiff's policy states that Genworth "will base any change" in its Monthly Risk Rates "on its expectations as to future investment earnings, mortality, persistency, expenses and taxes." Genworth does not contend that the increase is based on any other factors, telling policyholders that the "Monthly Risk Rate adjustments are based upon our expectations as to future investment earnings, mortality, persistency, expenses, and taxes." But no change to any of these

enumerated factors independently, nor when considering all of the enumerated factors together, could warrant the massive rate increase.

### 1.  GLIC's Expectations as to Future Mortality Have Improved

43.    Expectations of future mortality experience are typically the main driver of Monthly Risk Rates. Genworth's own SEC filings expressly refer to COI charges—which Monthly Risk Rates are used to calculate—as "mortality charges" and state that they are intended to compensate for mortality risk:

> We also collect cost of insurance charges on our variable life insurance products to compensate us for the mortality risk of the guaranteed death benefit, particularly in the early years of the policy when the death benefit is significantly higher than the value of the policyholder's account.

Genworth 2007 10-K Annual Report at 11.

44.    GLIC's expectations as to future mortality could not have suddenly changed materially for the worse to warrant an increase in Monthly Risk Rates, much less a massive one. Insurers like GLIC systematically quantify their "expectations of future mortality" on an annual or biennial basis. They perform experience studies which examine their historical mortality experience and, from that mortality experience, develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality. Genworth Financial's Annual Reports confirm that

Genworth updates its expectations annually, and that its mortality and other actuarial assumptions do not vary between GLIC and GLAIC. Those reports discuss Genworth's "annual review of assumptions," typically done in the fourth quarter, which includes a review of Genworth's "persistency, long-term interest rates, mortality" and other factors underlying its universal life policies. As described in more detail below, the fact that Genworth conducts annual assumption reviews makes it impossible that any recent changes purportedly necessitated a 140 percent increase.

45.    Beginning at least as early as 1941, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. The Society of Actuaries ("SOA") has established a committee to develop an update of the Commissioners Standard Ordinary ("CSO") tables, which are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. The CSO tables are conservative tables, which add scalars to the expected mortality. A report on the updated CSO tables by the SOA was published in October 2015 and showed significant reductions in insurance company reserves due to recent mortality improvements.

46.    The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table for reserves until 2001. In 2001, at the request of the NAIC, SOA and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table for reserves and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

47.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit that Genworth should have passed on to policyholders. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

48.     The SOA established a committee to develop an update of the CSO tables. A report on the updated CSO tables by the SOA was published in October 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

49.     The 2001 CSO Mortality Table was generated from the 1990–1995 Basic Mortality Tables published by the SOA. The SOA performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975–1980 Basic Select and Ultimate Mortality Table
- 1985–1990 Basic Select and Ultimate Mortality Tables
- 1990–1995 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

50.     The 1990–1995 Basic Table reflected the death rates observed by twenty-one large life insurance companies with policy anniversaries between 1990 and 1995. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990–1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. The report accompanying the 2015 Valuation Basic Table states: "The current CSO table was created in 2001 based on experience from 1990–1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee ('ILEC') have shown significant mortality improvement in the mortality rates experienced by the industry from that underlying the 2001 CSO table development." Other surveys have also noted mortality improvements. In May 2013, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements. The report relied on a survey of insurance companies—including Genworth. In March 2014 the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that are strongly improved over 2001 VBT. Their report relied on a survey of insurance companies—including Genworth.

51.     This trend of improving mortality expectations continued through the time of the COI increase at issue in this case. In 2017, for example, the SOA published a study with recommendations for mortality improvement assumptions for insurance reserving for AG-38 (Actuarial Guideline No. 38), which covers reserving for certain universal life insurance policies. The SOA updates this study annually and these studies show improving mortality across the board for the last five years, with no negative figures in any published table from 2013 and 2017. And in

2019, the SOA issued a report finding that in 2018, the United States age-adjusted mortality rate realized its largest decrease since 2009, and the 2018 mortality rate is now the lowest mortality rate in U.S. history. These mortality improvements represent a substantial benefit that Genworth should have passed on to policyholders in the form of cheaper Monthly Risk Rates, but never did.

52.    Industry insiders also report continuing and consistent mortality improvements. For example, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show increases in life expectancy and lowering of mortality rates between 2010 and 2015 for older-aged individuals in the United States. And a SOA report on historical population mortality rates shows continuing mortality improvements every five years between 2000 and 2014.

53.    GLIC has repeatedly acknowledged that, consistent with industry experience, its expectations of future mortality have improved. Each year, insurers are required to file annual interrogatory statements with the NAIC. These sworn statements are certified and signed by an actuary. The interrogatories include questions regarding Monthly Risk Rates and whether future expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., Monthly Risk Rates] different from current experience?" In reporting for each of 2014, 2015, 2016, 2017, and 2018, GLIC stated that it expected a "continuation" of recent trends such as "mortality improvement." GLIC has therefore acknowledged the trend of improved expectations of future mortality and admits that it expects this trend to continue.

### 2.  The Other Enumerated Factors Do Not Warrant Any Monthly Risk Rate Increase, Let Alone a 130% Increase

54.    Genworth also suggests that the increase is based on changes in the other factors— its expectations as to future investment earnings, persistency, expenses and taxes—but it has not

explained how. The massive increase could not be justified based on changes to any of these factors, especially in light of improving mortality expectations, which outweigh any of these factors.

55.    *__First__*, GLIC's expectations as to "future investment earnings" could not have changed materially for the worse in recent years to warrant an increase in Monthly Risk Rates, much less a massive one. In Genworth Financial's financial statements, Genworth indicated that its "net investment income" and "yield" on that income has ***grown*** in in the years preceding the rate increase, reporting: $3.138 billion with 4.5% yield (2015), $3.159 billion with 4.5% yield (2016), $3.200 billion with 4.6% yield (2017), $3.262 billion with 4.6% yield (2018). Similarly, Genworth Financial reports a "discount rate" that "represents our expected investment returns," and its discount rate assumption for its main long-term care block has generally increased in recent years: 5.24% (2015); 5.31% (2016); 5.3% (2017); 5.3% (2018). GLIC's interrogatory statements have stated, since at least 2014, that "the interest rate environment has declined significantly since many of the in-force products were priced," but Monthly Risk Rates may only be changed to account for changes in *future* experience factors, not to compensate the company for any investment losses in the past. Further, the policies have a *separate* "credited interest rate," which is adjustable to account for any changes in the interest rate environment.

56.    *__Second__*, GLIC's expectations as to future "persistency" could not have changed for the worse in recent years to warrant an increase in Monthly Risk Rates, much less a massive one. Plaintiff's policies issued in 2003, and on information and belief, all Subject Policies have been in force for more than six years. A 2012 SOA industry study—reporting on a survey of the industry— indicated that between 2001 and 2009, the industry lapse rates for universal life policies that have been in force more than six years are stable, varying less than approximately 2 percentage points

over that span, and that the lapse rates become more stable the longer the policy has been in force. This indicates that any volatility that Genworth may have seen in these policies would have occurred in the early years, not now. And to the extent Genworth priced the policies using unreasonable lapse-supported assumptions, it may not now pass the projected late duration losses on to persisting policyowners through a Monthly Risk Rate increase.

57.   ***Third***, GLIC's expectations as to future "expenses" could not have changed materially for the worse in recent years to warrant an increase in Monthly Risk rates, much less a massive one. For example, Genworth Financial's financial statements report on its "acquisition and operating expenses, net of deferrals," which it describes as the "costs and expenses related to the acquisition and ongoing maintenance of insurance and investment contracts." These too have **decreased** in recent years: $1.273 billion (2016); $1.022 billion (2017); $0.997 billion (2018). Furthermore, the large majority of expenses incurred by an insurance company for universal life insurance policies occur at the time of sale the policy, with the commitment to pay origination commissions to sales teams. Genworth cannot base its change on events that happened in the past (i.e., the sale of the policy) without violating the contract's bar on recouping prior losses. Additionally, the allocated expense of maintaining insurance contracts is nominal—typically $50 to $100 per policy per year—and does not materially change from year to year, let alone in a way that could justify a 140 percent increase in Monthly Risk Rates. In fact, the Subject Policies already charge a separate "monthly administrative fee" and "premium expense charge" designed to cover these expenses.

58.   ***Fourth***, GLIC's expectations as to future "taxes" could not have changed for the worse in recent years to warrant an increase in Monthly Risk Rates, much less a massive one. To the contrary, Genworth's expectations as to future taxes are now materially better, as a result of

the corporate tax reform, which should have resulted in lower Monthly Risk Rates, not an increase

in rates. After the Tax Cuts and Jobs Act ("TCJA") corporate tax reform was announced, Genworth

Financial stated in public filings that this benefited Genworth Financial's tax outlook going

forward, including a $154 million benefit in 2017:

> Prior to the recent TCJA, the top U.S. corporate federal income tax rate was 35%
> for corporations with taxable income greater than $10 million. The TCJA reduced
> the U.S. corporate federal income tax rate to 21% effective for taxable years
> beginning after December 31, 2017. Included in our 2017 benefit for income taxes
> is $154 million of tax benefits associated with revaluing our deferred tax assets and
> liabilities to the new rate on the date of enactment.[3]

### ii.    The Monthly Risk Rate Increase Recouped Past Losses

59.    The policies prevent GLIC from making "any change" in Monthly Risk Rates "in

order to recoup prior losses." This provision forbids rate increases to make up for past losses, or

from implementing a rate increase that would result in the carrier making more profit on the

policies than it previously expected using its prior expectations. One purpose of this provision—

like the interrogatories to regulators discussed above—is to prevent the insurer from engaging in

a bait-and-switch tactic, where it projects cheaper Monthly Risk Rates in the future, collects

premiums, and then turns around years later and reveals more expensive Monthly Risk Rates due

to changes in expectations that happened long ago or were present at the time of the sale.

60.    The provision against recoupment of past losses is particularly important for

universal life insurance policies issued in the 1990s and early 2000s, when the market was

extremely competitive and abuses by insurance companies were rampant. At that time, insurance

companies principally relied upon sales illustrations to sell universal life insurance policies to

---

[3] In its Annual Statement for 2018, GLAIC states that it is "an affiliated member of a consolidated
Life/Non-Life U.S. Federal income tax return with its ultimate parent company, Genworth
Financial, Inc. ("Genworth"), and will be included" in the consolidated Federal income tax return
for 2018 with, among other entities, GLIC and GLICNY.

consumers. In their quest to illustrate the most competitive products (i.e., providing higher death benefits and policy values for a lower cost), insurance companies like GLIC often adopted overly aggressive and unreasonable pricing assumptions. To the extent that GLIC did so, it cannot now recoup those prior losses—particularly when it continued to illustrate the same, original Monthly Risk Rates through 2018, and certified that those illustrations are "reasonably based on actual recent historical experience."

61.    Indeed, states developed regulations designed to curtail this type of life insurance industry practice, and Genworth's letter to policyholders even references these "illustration regulations." It states, "illustration regulations require that a product meet certain testing conditions before an insurance company can provide policyholders with an illustration of that product based on current rates." More specifically, insurance regulations require that universal life illustrations be "reasonably based on actual recent historical experience." Thus, if mortality, for example, has deteriorated to such a degree that a rate increase could be justified, the insurer has to change its illustrations, and cannot continue projecting to policyholders that current rates will remain in effect. At least as late as March 2018, GLAIC was certifying that its illustrations were supported by its then-current mortality, persistency, expense, and investment earnings expectations, and continuing to illustrate pre- increase Monthly Risk Rates.

62.    For the reasons stated above, it is simply impossible that GLIC's cost expectations suddenly deteriorated by 140 percent between March 2018 to September 2019. For such an increase to be justified, GLIC's projected mortality rates would have had to double. In its financial statements, Genworth claims to do an "annual review" of its actuarial assumptions, including its mortality assumptions. A doubling of mortality rates could not have happened in one year.

63.     So, to the extent GLIC's mortality and other assumptions have not been as good as it originally expected for these policies, those losses were recognized and accepted by GLIC long ago, thereby establishing a new baseline for any future increase. GLIC cannot use a prospective rate increase to make up for losses that it knew about, and accepted, long ago, which it certified as being the "anticipated experience factors underlying [its] nonguaranteed elements," and which it continued to use in illustrations through at least March 2018. To do so would be to recoup past losses, in violation of the express terms of the Subject Policies.

64.     Instead of being motivated by recent changes to its expectations as to future investment earnings, mortality, persistency, expenses and taxes, the COI increase appears driven by Genworth's desire to increase profits, recoup prior losses, induce lapses of older age policies, and offset enormous losses in Genworth's LTC business (for which Genworth's universal life policyholders bear no responsibility). Genworth's "U.S. Life Insurance division" houses both its LTC and universal life business, which is held by GLIC, GLICNY and GLAIC. Genworth recently tried to separate the LTC and universal life businesses in a planned sale to a Chinese company, called Oceanwide, but insurance regulators rejected the plan to decouple the LTC and universal life business. As a result, Genworth still uses profits from GLIC's universal life business to shore up its failing LTC unit, and this COI increase is part of that effort.

65.     In August 2013, Genworth Financial's President announced that Genworth was "conducting an intense, very broad and deep review of all aspects of our long-term care insurance business." On an October 30, 2013 conference call, Genworth Holding, Inc.'s CEO, Thomas McInerney, confirmed that the review was complete and the reserves were adequate: "And while we have been saying for some time that we believe the reserves were adequate within margin. We're now saying, or I said today, that after this four-month extensive review, we're more

confident than we've ever been that the reserves are adequate, within a comfortable margin." He explained, "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes" and that review "consider[ed] all important aspects" including "[t]he assumptions, best estimates and also a detailed review of our statutory reserves." On a December 2013 presentation after completing Genworth's "very broad and deep review" into all aspects of its LTC business, with an emphasis on reserves, Mr. McInerney stated "we have adequate long-term care reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions." This conclusion, Genworth said, was derived from "very credible experience on 190,000 claims that we look at."

66.    In November 2014, Genworth announced that its reserves were woefully inadequate, and that it needed to increase reserves by $531 million and take an after-tax charge of $345 million in the third quarter. That charge was tied to updated assumptions, including mortality assumptions, for its LTC insurance division, which led to a $844 million loss in that quarter alone. These mortality assumptions were improved from when Genworth last did a deep review in 2013. Genworth's shares plunged 38 percent, wiping more than $2.69 billion in the company's market capitalization. Genworth Financial announced that as a result of this restatement, Genworth Financial would "forego dividend payments from the life division for the remainder of 2014 and 2015." Prior to this, Genworth Financial's insurance subsidiaries—principally GLIC and GLAIC—had paid unearned dividends to the Genworth Financial holding company of at least $545 million from 2010 through 2014. After the November 2014 announcement, the ratings agencies significantly downgraded Genworth Financial's ratings, with S&P announcing that it had "lowered its long-term counterparty credit and senior unsecured debt ratings on Genworth" to junk status. S&P also assigned Genworth Financial a "negative outlook," which reflected "execution

risk in the turnaround of the U.S. life insurance division." Genworth Financial then admitted that the rating changes "are expected to reduce sales in some of [Genworth's] products," and "future borrowing costs are likely to increase."

67.    To combat these losses due to improved mortality among other factors, Genworth launched a plan to dramatically increase LTC premiums. In its 2018 Annual Report, Genworth went so far as to recognize that "the continued viability" of "GLIC" depends on "on our ability to obtain significant price increases" through "increased premiums" or benefit reductions. As part of this strategic plan to increase premiums, Genworth Financial reported in October 2019 that it "has achieved approximately $11.5 billion of approved LTC premium rate increases" since 2012. In 2014, Genworth Financial's CEO told investors that Genworth is "leading the charge on reshaping this industry" as it pursues rate increases. Amid this turmoil, on March 7, 2016, Genworth suspended sales of traditional life insurance and fixed annuity products—including all universal life insurance.

68.    The situation with Genworth's LTC business remained dire in the years and months leading up to the Monthly Risk Rate increase. In August 2019, ratings agency Fitch Group issued a report again questioning the health of Genworth Financial, and its LTC business, suggesting it has an inadequate amount of cash on hand to pay future insurance claims associated with old age. Fitch made its assessment based largely on what it called "aggressive" assumptions about the reserves needed to pay future benefits to LTC policyholders, including mortality assumptions.[4] The mortality assumptions are aggressive in the sense that they ***underestimate*** how long people

---

[4] Gia Curci, Genworth, GE and Unum Need to Shore Up Long-Term Care Business: Report, Investment Report, Aug. 20, 2019, *available at*:
 investmentnews.com/article/20190820/FREE/190829991/genworth-ge-and-unum-need-to-shore-up-long-term-care-business-report.

will live. In the context of LTC insurance, the fact that mortality rates are overstated would necessitate higher premiums. In the context of universal life insurance, by contrast, the fact that mortality assumptions are overstated means that cost of insurance rates should be reduced. Yet Genworth now seeks to increase those Monthly Risk Rates by up to 140 percent in order to subsidize its LTC unit.

69.     Meanwhile, in an October 2019 investor call—around the same time the COI increase was implemented—Genworth's CFO, Kelly L. Groh, repeated that it is now Genworth Financial's intention to manage "all of our U.S. life entities on a stand-alone basis with no other future plans to infuse capital in these businesses." To make up for the failing LTC business, he said that "the U.S. life businesses," including GLIC and GLAIC, will rely on "prudent management of in-force blocks and the actuarially justified rate actions to satisfy policyholder obligations."

70.     This COI increase is part of that plan (except it is not actuarially justified): a "rate action" and "management of in-force blocks" done in order to make up for past losses in an unrelated LTC business. Such an increase is not permitted under the terms of the Subject Policies.

### iii.     The Monthly Risk Rate Increase Was Not Applied Uniformly

71.     The policies require that any "change in the monthly risk rates will apply to all insureds with the same combination of the following: attained age; number of years of insurance in force; net amount of risk; and premium class." The Genworth entities breached this provision by, on information and belief, not imposing the rate increase on New York policyholders with the same combination of characteristics. Genworth issues New York policies out of Genworth Life Insurance Company of New York (GLICNY). On information and belief, GLICNY issued policies that are materially identical to the Subject Policies, and that were priced using the same

assumptions; further, GLICNY's actuarial assumptions for universal life policies are the same as GLIC's and GLAIC's. But while the GLIC and GLAIC entities have announced Monthly Risk Rate increases; on information and belief, GLICNY has not.

72.     Further, Genworth's bulletin announcing the rate increase adds a limiting phrase that is not in the contract when describing how the increase was implemented, saying that "this adjustment is being made for all policies **on the same policy form** with the same combination of the following characteristics: Attained age, sex, length of time insurance has been in force, net amount at risk; and premium class." But the uniformity provision in the Subject Policies does not contain a limitation only for policies issued "on the same policy form." On information and belief, that provision was breached because Monthly Risk Rates were not adjusted on policies issued on different policy forms, even though they had the same combination of "attained age; number of years of insurance in force; net amount of risk; and premium class."

73.     Lastly, Genworth violated the uniformity clause because, even among non-New York policies issued by GLIC on the same form, the Monthly Risk Rate increase is not uniform by "attained age; number of years of insurance in force; net amount of risk; and premium class." Specifically, the Monthly Risk Rate increases vary depending on whether the insured is male or female. Despite the word "sex" being referenced multiple places in the Subject Policies, it is not identified in the Monthly Risk Rate provision as a basis for differing treatment.[5] GLIC thus plainly violated the policy terms by treating male and female insureds differently.

## CLASS ACTION ALLEGATIONS

---

[5] Sex is not a component of premium class. For example, Plaintiff's premium class is explicitly identified in the Policy as "Preferred, No Nicotine Use."

74.     This action is brought by Plaintiff individually and on behalf of a class pursuant to

Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to as the "COI

Overcharge Class"—consists of:

> All owners of universal life insurance policies issued or insured by Genworth Life
> Insurance Company, or its predecessors or successors, who have experienced a
> Monthly Risk Rate increase, under the Monthly Risk Rate increase announced on
> or about December 1, 2019 (excluding defendant Genworth Life and Annuity
> Insurance Company, its officers and directors, members of their immediate
> families, and the heirs, successors or assigns of any of the foregoing).

75.     This class consists of at least hundreds of consumers of life insurance and is thus

so numerous that joinder of all members is impracticable. The identities and addresses of class

members can be readily ascertained from business records maintained by GLIC.

76.     Plaintiff's claims are typical of the claims asserted by the COI Overcharge Class.

77.     Plaintiff will fairly and adequately protect the interests of the COI Overcharge Class

and does not have any interests antagonistic to those of the other members of this class. Plaintiff

is willing and prepared to serve the Court in a representative capacity.

78.     Plaintiff has retained attorneys who are knowledgeable and experienced in life

insurance matters, COI increase matters, as well as class and complex litigation.

79.     Plaintiff requests that the Court afford class members with notice and the right to

opt-out of any class certified in this action. The names and addresses of all class members are in

Genworth's business records, and class members are readily and objectively identifiable.

80.     This action is appropriate as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure because common questions of law and fact affecting the class predominate over

those questions affecting only individual members. Those common questions include:

        (a)     the construction and interpretation of the form insurance policies at issue in

this litigation;

(b)     whether GLIC's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c)     whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages.

81.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

### FIRST CLAIM FOR RELIEF

### Breach of Contract
### (on behalf of Plaintiff and the COI Overcharge Class)

82.    Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

83.    The Subject Policies are binding and enforceable contracts.

84.    The rate increases that GLIC began imposing on or after December 1, 2019 breached the terms of the Subject Policies in multiple ways, including but not limited to:

(a)    not basing the 2019 Monthly Risk Rate increase on the factors enumerated in the contract;

(b)    imposing a massive increase in Monthly Risk Rates to recoup prior losses;

(c)    imposing non-uniform rate hikes on insureds;

(d)    failing to provide an illustration upon request; and

(f)    improperly breaching the covenant of good faith and fair dealing.

85.    Plaintiff and the COI Overcharge Class have performed all obligations under the policies, except to the extent that their obligations have been excused by GLIC's conduct as set forth herein.

86.    As a direct and proximate cause of GLIC's material breaches of the policies, Plaintiff and class members have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the COI Overcharge Class pray for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiff and the COI Overcharge Class compensatory damages, restitution, disgorgement, reinstatement of lapsed and/or surrendered policies, and any other relief permitted by law or equity;

3.      Awarding Plaintiff and the COI Overcharge Class pre-judgment and post-judgment as well as costs, and all other relief set forth above; and

4.      Awarding Plaintiff and the COI Overcharge Class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.


Dated: October 20, 2023                    Respectfully submitted,


                                           /s/ Kathleen J.L. Holmes
                                           Ellen D. Marcus (Virginia Bar No. 44314)
                                           Kathleen J.L. Holmes (Virginia Bar No. 35219)
                                           HOLMES COSTIN & MARCUS PLLC
                                           908 King Street, Suite 330
                                           Alexandria, VA 22314
                                           Tel:    703-260-6401
                                           Fax:    703-439-1873
                                           emarcus@hcmlawva.com
                                           kholmes@hcmlawva.com

                                           Steven G. Sklaver (*pro hac vice* to be filed)
                                           Glenn Bridgman (*pro hac vice* to be filed)
                                           Nick Spear (*pro hac vice* to be filed)

SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-6029
Tel:     310-789-3100
Fax:     310-789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
nspear@susmangodfrey.com

Seth Ard (*pro hac vice* to be filed)
Ryan Kirkpatrick (*pro hac vice* to be filed)
Zach Savage (*pro hac vice* to be filed)
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel.:    212-336-8330
Fax:     212-336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
zsavage@susmangodfrey.com

*Attorneys for Plaintiff and Proposed Class*